

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JONATHAN MCGLOTHIAN, <u>et al.</u>,         )
    Plaintiffs,                               )
                                     )
        v.                                    )         Civil Action No. 3:18CV507(REP)
                                     )
W. HEYWOOD FRALIN, <u>et al.</u>,           )
    Defendants.                               )
_____)

### REPORT & RECOMMENDATION

#### On Defendants' Motion to Dismiss the Amended Complaint and Plaintiffs' Motion for Preliminary Injunction

Jonathan McGlothian, Tracy McGlothian, and the Mt. Olivet Group, LLC (collectively, "Plaintiffs") bring this action against W. Heywood Fralin, H. Eugene Lockhart, Henry Light, Ken Ampy, Rosa Atkins, Marge Connelly, Victoria D. Harker, Stephen Moret, William Murray, Carlyle Ramsey, Minnis E. Ridenour, Tom Slater, Katharine M. Webb, and Peter Blake (collectively, "Defendants" or "SCHEV") in their official capacity as leaders and members of the State Council of Higher Education for Virginia ("SCHEV"), alleging violations of their rights under the First and Fourteenth Amendments of the United States Constitution.  This matter is before the Court pursuant to 28 U.S.C. § 636(b)(1)(B) for a Report and Recommendation on Defendants' Motion to Dismiss for Failure to State a Claim ("Motion to Dismiss") (ECF No. 20) under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and Plaintiffs' Motion for Preliminary Injunction (ECF No.

4).  The motions have been fully briefed and are ripe for review. The Court dispenses with oral argument because the materials before the Court adequately present the facts and legal contentions, and argument would not aid the decisional process at this stage.  E.D. Va. Loc. Civ. R. 7(J).  For the reasons set forth below, the undersigned RECOMMENDS that Defendants' Motion to Dismiss be DENIED and Plaintiffs' Motion for Preliminary Injunction be DENIED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure instruct that the Court accept as true a plaintiff's well-pleaded allegations, viewing all facts and drawing all reasonable inferences in the light most favorable to him.  T. G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan, LLC, 385 F.3d 836, 841 (4th Cir. 2004) (citing Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993)).  Applying these standards, the following facts are established for the purpose of the Motion to Dismiss and will be considered for purposes of the Motion for Preliminary Injunction.

### A. JONATHAN AND TRACY MCGLOTHIAN'S COURSES AT THE MT. OLIVET GROUP

Plaintiff Jonathan McGlothian teaches project management classes through contracts with private companies and military units. (Am. Compl. ¶ 5.)  The Project Management Institute, a private-sector professional body, is the largest certification body for the project management profession.  (Id. ¶ 17.)  The Project Management Institute's primary certification is the Project Management

2

Professional ("PMP") certificate, which signals proficiency in project management. (Id. ¶¶ 17, 18.) To sit for the PMP certification test, candidates must have completed thirty-five hours of project management education and possess either: (a) a college degree and 4,500 hours of experience leading and directing projects; or (b) a high school diploma and 7,500 hours of experience leading and directing projects. (Id. ¶ 20.)

Jonathan McGlothian teaches project management classes through the entity he co-founded with his wife, Tracy McGlothian—The Mt. Olivet Group, LLC ("TMOG"). (Id. ¶ 26). Within TMOG, there are multiple educational programs, specifically the TMOG Learning Center and Virginia Beach Sewing Solutions. (Id. ¶¶ 28, 43.) Jonathan and Tracy McGlothian are the sole owners of TMOG; Jonathan McGlothian serves as its President, and Tracy McGlothian is the Vice-President. (Id. ¶¶ 26, 42.) TMOG operates the TMOG Learning Center, through which Jonathan McGlothian prepares candidates for the PMP exam through a thirty-five hour course spread over five days of instruction. (Id. ¶ 28). Because the Project Management Institute recognizes TMOG as a registered educational provider, PMP candidates can use Jonathan McGlothian's course to satisfy the PMP certification requirement that they complete thirty-five hours in project management education. (Id.)

In addition to the PMP test-preparation course, Jonathan McGlothian teaches other courses on project management, including

courses titled "Project Management Fundamentals," "Project Management Essentials," "Practical Project Management Training," and "Leadership Skills." (Id. ¶ 29.) He teaches courses to prepare students for other Project Management Institute certification exams, including tests to become a Certified Associate in Project Management and Agile Certified Practitioner. (Id. ¶ 30.) In addition to test preparation, he also teaches general project management skill classes. (Id. ¶ 31.)

Tracy McGlothian, an experienced seamstress, manages Virginia Beach Sewing Solutions, a custom sewing and embroidery operation within TMOG. (Id. ¶¶ 41, 43.) In this role, she trains employees to use commercial-grade sewing machines through contracts with employers. (Id. ¶ 43.) She also teaches classes training students how to sew as a hobby. (Id. ¶ 44.)

The TMOG Learning Center has never offered degrees of college credit, accepted student loans, or received federal Department of Education funds for any of the McGlothians' classes. (Id. ¶¶ 40, 47.) Jonathan McGlothian teaches his project management classes only through contracts with military units and private employers. (Id. ¶¶ 34, 35.) Tracy McGlothian teaches her commercial sewing courses only through contracts with private employers (id. ¶ 43), and teaches students solicited from the public only how to sew as a hobby (id. ¶ 44, 45).

## B. THE CHALLENGED STATUTES

Plaintiffs seek injunctive relief against enforcement of Va. Code §§ 23.1-213 to 23.1-228 and 8 Va. Admin. Code §§ 40-31-10 to 40-31-320 (collectively, the "Vocational School Law").

SCHEV is Virginia's coordinating body for higher education established "to advocate for and promote the development and operation of an educationally and economically sound, vigorous, progressive, and coordinated system of higher education in the Commonwealth . . . ." Va. Code § 23.1-200.[1] SCHEV regulates private postsecondary schools, which include programs of academic, vocational, and continuing professional education with curricula designed for students with a high school diploma or its equivalent, or for students who are beyond the age of compulsory high school attendance, and for which tuition or a fee is charged. Va. Code § 23.1-213; 8 Va. Admin. Code § 40-31-10. "Postsecondary school" does not include basic adult educational programs or avocational programs, which are instructional programs not intended to prepare students for employment but are intended solely for recreation or as a hobby, or courses that prepare individuals to teach such pursuits. Va. Code § 23.1-213; 8 Va. Admin. Code § 40-31-10. SCHEV is responsible for creating and enforcing the procedures to ensure that

---

[1] The Court considers Virginia Code § 23.1-200 even though it is not referred to in Plaintiffs' Amended Complaint because the Court can take judicial notice of the statute. See infra III(B)(i) for a discussion of the issue.

postsecondary schools meet the minimum standards in their operations.   Va. Code § 23.1-215(A).

In furtherance of its statutory duties, SCHEV requires postsecondary schools that solicit students from the public to obtain certification to operate in the Commonwealth once the school obtains a valid business license.   Va. Code § 23.1-217.   The certification criteria for career-technical schools include, inter alia: providing information and documentation concerning a school's admission requirements, maintenance of student records and financial records, and the school's refund policy for tuition, 8 Va. Admin. Code § 40-31-160; determining that a school's courses, curriculum, and instruction are of sufficient quality, content, and length to adequately achieve a school's stated objective, id. § 40-31-150; and, determining that the faculty have appropriate educational backgrounds for their areas of instruction and appropriate professional certification or licensure, if appropriate in that field, id. In the certification application, a postsecondary school must: provide SCHEV with the results of an annual audit, id. § 40-31-160(H)(1); demonstrate that it creates transcripts for students and contracts with a third-party school or records maintenance organization to preserve such transcripts in the event that the school closes, id. § 40-31-160(E)(2); demonstrate that students have access to an "adequate and appropriate" library, id. § 40-31-160(M); create publicly available documents, brochures and catalogues

6

detailing a variety of information regarding the school, id. § 40-31-160(B), (C), (D), (F), (J); and, allow SCHEV to conduct random audits of its programs to verify compliance with the regulatory scheme, id. § 40-31-200(A). Postsecondary schools must pay a $2,500 application fee, id. § 40-31-260(D), as well as submit a surety instrument with SCHEV in an amount equal to the total tuition that the school collects, § 40-31-160(I), 40-31-160(B)(3). SCHEV will certify a school only after it has conducted a physical examination of its facilities. Id. § 40-31-130(D).

SCHEV exempts certain schools, programs, degrees, diplomas, and certificates from its certification process. Id. § 40-31-60. Professional programs for professional or occupational training offered to the extent the program is subject to approval by a regulatory board pursuant to Title 54.1 are exempt. Id. Also exempt are nursing education programs at schools that are subject to approval by the Virginia Board of Nursing, id., theological education, continuing-education classes, preparation for professional-practice and educational tests, among others. See Va. Code § 23.1-226(B); 8 Va. Admin. Code §§ 40-31-40 - 40-31-60. Certification is not required if the school teaches courses offered "solely on a contractual basis for which no individual is charged tuition and there is no advertising for open enrollment." Va. Code § 23.1-226(B)(6).

Applicants denied certification or an exemption from certification can request a fact-finding, administrative review of SCHEV's determination under the Virginia Administrative Process Act. 8 Va. Admin. Code §§ 40-31-220, 40-31-70.  Administrative hearings are conducted by an independent hearing officer appointed by the Supreme Court of Virginia, and the hearing officer's determinations can be further appealed or reviewed by an independent administrative appeal panel.  Id.  Violations of SCHEV's regulations may be punishable as a Class 1 misdemeanor; each course or program offered in violation constitutes a separate offense.  Va. Code § 23.1-228; 8 Va. Admin. Code § 40-31-230.  As a Class 1 misdemeanor, violations are punishable by up to one year of incarceration, $2,500 in criminal fines, and a civil fine of $1,000 per violation for a maximum total of $25,000 civil fine per year.  Va. Code §§ 18.2-11(a), 23.1-228(A), 23.1-228(B).

### C. PLAINTIFFS' ATTEMPTS AT SCHEV CERTIFICATION

Jonathan McGlothian attended a SCHEV orientation workshop for new schools in March 2016 to learn about SCHEV's postsecondary school certification process.  (Am. Compl. ¶ 48.)  Plaintiffs applied for SCHEV certification of the TMOG Learning center as a "career technical" school in November 2016 (the "2016 Application").  (Id. ¶ 49.)  In the 2016 Application, Plaintiffs proposed a seventy-hour project management program taught by Jonathan McGlothian and a sewing, embroidery, and life skills program taught by Tracy

McGlothian. (Id. ¶¶ 50, 51.) Plaintiffs spent more than one-hundred hours completing the 2016 Application and paid SCHEV $2,500 in application fees. (Id. ¶¶ 52, 53.) To prepare for the 2016 Application, Plaintiffs rented commercial property for classroom space to meet SCHEV's criterion and spent more than twenty-thousand dollars on rent payments, furniture, and fixtures. (Id. ¶ 53.)

On December 28, 2016, SCHEV informed Plaintiffs that their application package was incomplete and sent a letter including SCHEV's "initial assessment," listing the deficiencies and the additional information required to complete the application. (Id. ¶ 54; Ex. 5, ECF No. 21-4).) Plaintiffs resubmitted their SCHEV application on March 16, 2017 and included additional requested information (the "2017 Application"). (Am. Compl. ¶ 56.) The 2017 Application also totaled hundreds of pages, and the McGlothians spent dozens of hours completing it. (Id. ¶ 57.) SCHEV informed Plaintiffs that the 2017 Application was unsatisfactory. (Id. ¶ 58.) Accordingly, Plaintiffs withdrew from the SCHEV application process. (Id. ¶ 59.)

On September 27, 2017, Plaintiffs sent a letter and an application to SCHEV seeking an exemption from SCHEV certification on behalf of the TMOG Learning Center under Va. Code § 23.1-226(B)(9), which exempts from regulation "[t]utorial instruction delivered and designed to . . . prepare an individual for an examination for professional practice or higher education." (Id. ¶

9

61.) By letter dated October 30, 2017, SCHEV denied Plaintiffs' exemption application as the project management classes and PMP preparation courses were not considered "professional practice." (Id. ¶¶ 63, 64.) SCHEV informed Plaintiffs that they would need SCHEV certification to offer programs that prepare individuals for project management certification tests. (Id. ¶ 66.)

On November 29, 2017, Jonathan McGlothian again sought a statutory exemption from SCHEV certification on behalf of the TMOG Learning Center. (Id. ¶ 67.) On December 18, 2017, SCHEV again denied the request. (Id. ¶ 68.) Plaintiffs no longer wish to apply for SCHEV certification but would like to teach project management test preparation, project management classes, and vocational sewing to students solicited from the public. (Id. ¶¶ 70-72.)

On July 23, 2018, Plaintiffs filed the instant action praying that the Court enjoin SCHEV from enforcing the Vocational School Law against Plaintiffs, allowing them to solicit students from the public without certification. Plaintiffs received a letter dated August 9, 2018 from SCHEV's Director of Private Postsecondary Education, Sylvia Rosa-Casanova, accusing them of running an illegal postsecondary school, threatening criminal charges against them, and informing them that SCHEV would refer their matter to the Virginia Attorney General's Office to institute a civil proceeding against them. (Id. ¶¶ 95, 97.) The letter included a copy of an August 9, 2018 letter SCHEV sent to Virginia Beach's Commissioner of the

Revenue requesting that the city revoke TMOG's business license.
(Id. ¶ 96.)  Plaintiffs sent a reply letter to SCHEV objecting to
its content.  (Id. ¶ 99.)  Senior Assistant Attorney General Allen
Wilson sent Plaintiffs' counsel an August 17, 2018 letter on SCHEV's
behalf, wherein he claimed that SCHEV was statutorily required to
seek the revocation of Plaintiffs' business license but that he would
halt the enforcement procedures once SCHEV received documentation
showing that Plaintiffs were not violating SCHEV's regulations.  (Id.
¶¶ 99-100.)

Plaintiffs provided SCHEV with sworn declarations that they do
not offer classes to students solicited from the public and were in
full compliance with SCHEV's regulations.  (Id. ¶ 101.) SCHEV
requested further information regarding Plaintiffs' statements on
their website on August 22, 2018.  (Id. ¶ 102.)  SCHEV rescinded its
enforcement proceedings against Plaintiffs and informed the City of
Virginia Beach Commissioner of the Revenue that Plaintiffs were in
compliance with the Vocational School Law on August 28, 2019.  (Id.
¶ 103.)

## II. STANDARDS OF REVIEW

### A. MOTION TO DISMISS UNDER RULE 12(B)(1)

"Because Defendant[s] ha[ve] filed both a Motion to Dismiss for
lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)
and a Motion to Dismiss for failure to state a claim under Fed. R.
Civ. P. 12(b)(6), the challenge to subject matter jurisdiction

asserted in the motion under Rule 12(b)(1) must be addressed first."
James v. United States, 143 F. Supp. 3d 392, 394 (E.D. Va. 2015)
(citing Sucampo Pharms., Inc. v. Astellas Pharma, Inc., 471 F.3d
544, 548 (4th Cir.2006)).

A party may file a motion to dismiss under Rule 12(b)(1) for
lack of subject matter jurisdiction. "In determining whether
jurisdiction exists, the district court is to regard the pleadings'
allegations as mere evidence on the issue, and may consider evidence
outside the pleadings without converting the proceeding to one for
summary judgment. Richmond, Fredericksburg & Potomac R. Co. v.
United States, 945 F.2d 765, 768 (4th Cir. 1991). The plaintiff
bears the burden of establishing that federal jurisdiction is proper.
Piney Run Preservation Ass'n v. Cnty. Comm'rs of Carroll City, 523
F.3d 453, 459 (4th Cir. 2008).

### B. MOTION TO DISMISS UNDER RULE 12(B)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency
of a complaint; importantly, it does not resolve contests surrounding
the facts, the merits of a claim, or the applicability of defenses."
Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.
1992). Dismissals under Rule 12(b)(6) are generally disfavored by
the courts because of their res judicata effect. Fayetteville
Investors v. Commercial Builders, Inc., 936 F.2d 1462, 1471 (4th
Cir. 1991). The Federal Rules of Civil Procedure only require that
a complaint set forth "'a short and plain statement of the claim

showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (omission in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).   While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required to satisfy the pleading requirement of Federal Rule 8(a)(2).  Id. (emphasis added).   In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff.  Mylan Labs., 7 F.3d at 1134; see also Martin, 980 F.2d at 952.

### C. MOTION FOR PRELIMINARY INJUNCTION

"[A] preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  Perry v. Judd, 471 F. App'x 219, 223 (4th Cir. 2012) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).  Such remedy is "never awarded as of right." Winter, 555 U.S. at 24.   "[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way."  Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp., 17 F.3d 691, 693 (4th Cir. 1994).   Therefore, preliminary injunctions are "to be

granted only sparingly." Toolchex, Inc. v. Trainor, 634 F. Supp. 2d 586, 590-91 (E.D. Va. 2008) (quoting In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 524 (4th Cir. 2003)).

To be eligible for a preliminary injunction, the party seeking such relief must demonstrate each of the following factors: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and, (4) the public interest. Winter, 555 U.S. at 20; Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reinstated in relevant part, 607 F.3d 355 (4th Cir. 2010). Plaintiffs, as the party seeking a preliminary injunction, bear the burden of establishing that each factor supports granting the injunction. Real Truth, 575 F.3d at 346. Each factor must be demonstrated by a "clear showing." Winter, 555 U.S. at 22. The failure to show any one of the relevant factors mandates denial of the preliminary injunction. Real Truth, 575 F.3d at 346.

"Ordinarily, preliminary injunctions are issued to 'protect the status quo and to prevent irreparable harm during the pendency of a lawsuit . . . [so as] to preserve the court's ability to render a meaningful judgment on the merits.'" Perry, 471 F. App'x at 223 (quoting In re Microsoft Corp. Antitrust Litig., 333 F.3d at 525). Mandatory injunctive relief, however, alters the status quo by

commanding or requiring a party to perform a positive act. Mandatory preliminary injunctive relief "is disfavored, and warranted only in the most extraordinary circumstances." Id. (citing In re Microsoft Corp. Antitrust Litig., 333 F.3d at 525). Here, Plaintiffs ask the Court to require Defendants to take a positive act to change by status quo by allowing Plaintiffs to solicit students from the public for their vocational skills classes without having obtained SCHEV certification, as required by the Vocational School Law. "[A] mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." In re Microsoft Corp. Antitrust Litig., 333 F.3d at 526. Therefore, the Court treats Plaintiffs' Motion for Preliminary Injunction with increased caution because it requests mandatory relief.

### III. DISCUSSION

### A. RULE 12(B)(1) MOTION TO DISMISS

Defendants argue that the declaratory relief sought by Plaintiff is barred by the doctrine of sovereign immunity. (Mot. Dismiss, ECF No. 20.) That is not so. Sovereign immunity is a jurisdictional issue. See Research Triangle Inst. v. Bd. Of Governors of the Fed. Reserve Sys., 132 F.3d 985, 987 (4th Cir. 1997). "Sovereign immunity is the privilege of the sovereign not to be sued without its consent." Virginia Office for Prot. & Advocacy v.

15

Stewart, 563 U.S. 247, 254 (2011).  "[T]he sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment."  Alden v. Maine, 527 U.S. 706, 713 (1999). State officers acting in their official capacity are protected under sovereign immunity, because "'a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.'"  Lytle v. Griffith, 240 F.3d 404, 408 (4th Cir. 2001) (quoting Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989)).  In Ex Parte Young, 209 U.S. 123 (1908), the Supreme Court "established an important limit on the sovereign immunity principle."  Stewart, 563 U.S. at 254. Specifically, Ex Parte Young authorizes "suits against state officers for prospective equitable relief from ongoing violations of federal law." Lytle v. Griffith, 240 F.3d 404, 408 (4th Cir. 2001).

The Fourth Circuit has stated that "a State officer who acts in violation of the Constitution is stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." Antrican v. Odom, 290 F.3d 178, 184 (4th Cir. 2002).  Once that official is stripped of his "official or representative character," "the State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." Ex Parte Young, 209 at 159-60. The Ex Parte Young doctrine rests on the "fiction" that "when a federal court commands a state official to do nothing more than

16

refrain from violating federal law, he is not the State for sovereign-immunity purposes." Stewart, 563 U.S. at 254.

To determine whether the doctrine is applicable, a court "need only conduct a 'straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (quoting Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)). A prayer for declaratory relief "seeks a declaration of the past, as well as the future" but "does not impose upon the State" any retrospective monetary awards, thereby remaining within the purview of Ex Parte Young. Id. at 646 (emphasis in original); see also Antrican, 290 F.3d at 184-86 (permitting Medicaid recipients to seek declaratory and injunctive relief against state officials for alleged violations of federal law).

Here, Plaintiffs' claims clearly fit within the Ex Parte Young doctrine. Each Defendant is a director of SCHEV or a member of SCHEV's governing council and is sued in his or her official capacity. (Am. Compl. ¶¶ 8-12) Plaintiffs allege an ongoing violation of their First Amendment rights (id. ¶¶ 127-38), and are seeking only prospective injunctive and declaratory relief (id. Req. for Relief ¶¶ A-C). Defendants' attempts to circumvent the application of the Ex Parte Young doctrine are misguided because they improperly construe Ex Parte Young as solely an exception to the Eleventh

17

Amendment immunity.  However, the Ex Parte Young doctrine serves as an exception to immunity under both the Eleventh Amendment and the broader notion of state sovereign immunity.  See Stewart, 563 U.S. at 254; Ex Parte Young, 209 U.S. at 159-60.  Therefore, because Plaintiffs' request for declaratory relief fits squarely within the Ex Parte Young exception to sovereign immunity, Defendants' Rule 12(b)(1) Motion to Dismiss should be denied.

## B. RULE 12(B)(6) MOTION TO DISMISS

Defendants contend that Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) and should therefore be dismissed.

### i. CONSIDERATION OF DEFEDANTS' ATTACHED EXHIBITS

As a preliminary matter, the Court must first address whether it is appropriate to consider the thirteen documents Defendants attached to their Memorandum of Law in Support of Motion to Dismiss: (i) SCHEV's webpage discussing the agency's mission and goals (Ex. 1, ECF No. 21-1); (ii) a letter from Jonathan McGlothian to SCHEV regarding TMOG's business plans (Ex. 2, ECF No. 21-2); (iii) an article from the Department of Labor's website explaining the Workforce Innovation and Opportunity Act (Ex. 3, ECF No. 21-3); (iv) SCHEV's first deficiency letter to Plaintiffs dated December 28, 2016 (Ex. 4, ECF No. 21-4); (v) SCHEV's second deficiency letter sent to Plaintiffs dated April 6, 2017 (Ex. 5, ECF No. 21-5); (vi) SCHEV's first exemption letter to Plaintiffs denying Plaintiffs'

requested statutory exemption dated October 30, 2017 (Ex. 6, ECF No. 21-6); (vii) Plaintiffs' second exemption request letter sent to SCHEV dated November 29, 2017 (Ex. 7, ECF No. 21-7); (viii) SCHEV's second exemption letter denying Plaintiffs' requested statutory exemption dated December 18, 2017 (Ex. 8, ECF No. 21-8); (ix) TMOG's website detailing its professional development programming (Ex. 9, ECF No. 21-9); (x) an August 9, 2018 letter from SCHEV notifying Plaintiffs of its discovery that TMOG was operating a postsecondary school without SCHEV's approval (Ex. 10, ECF No. 21-10); (xi) an August 17, 2018 letter from Allen Wilson, Senior Assistant Attorney General, requesting more information from Plaintiffs demonstrating that they were not soliciting students directly from the public (Ex. 11, ECF No. 21-11); (xii) email correspondence between Ryan Waddell of the Attorney General's Office and Plaintiff's counsel from August 22, 2018 through August 24, 2018 (Ex. 12, ECF No. 21-12); and, (xiii) an August 28, 2018 letter from SCHEV to the Commissioner of the Revenue for Virginia Beach, rescinding SCHEV's August 9, 2018 letter (Ex. 13, ECF No. 21-13). For the reasons set forth below, the Court will not consider Exhibits 1 and 3 but will consider Exhibits 2, 4, 5, 6, 7, 8, 9, 10, 11, 12 and 13 when determining the sufficiency of Plaintiffs' Amended Complaint.

When reviewing a Rule 12(b)(6) dismissal, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted

into one for summary judgment."[2]  Witthohn v. Federal Ins. Co., 164 Fed. App'x 395, 396 (4th Cir. 2006) (citation omitted).  However, there are exceptions to this rule.  A court may take judicial notice of matters of public record.  Hall v. Virginia, 385 F.3d 421, 424 n.3 (4th Cir. 2004).  Similarly, a court may also consider those documents attached to the motion to dismiss, so long as they are "integral to[,] [] explicitly relied on in the complaint[,]" and authentic.  Phillips v. LCI Intern., Inc., 190 F.3d 609, 618 (4th Cir. 1999); see also Phillips v. Pitt County Memorial Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (citing Blankenship v. Manchin, 471 F.3d 523, 526 n.1 (4th Cir. 2006)).

A document is integral to the complaint where it is significantly related to a cause of action.  See W. Refining Yorktown, Inc. v. BP Corp. N. Am., Inc., 618 F. Supp. 2d 513, 515–17 (E.D. Va. 2009) (finding a contract integral to a breach of contract action); Mullins v. Wells Fargo Bank, N.A., 2017 WL 1202656, at *2 n. 2 (E.D. Va. 2017) (finding a promissory note and deed of trust as integral to a quiet title action).  A document is authentic when not in dispute by the opposing party.  LCI Int'l, 190 F.3d at

---

[2] The Court recognizes that, as an alternative to determining whether to consider the attached exhibits at the Motion to Dismiss stage, the Court has discretion to convert Defendants' Motion to Dismiss to a Motion for Summary Judgment under Federal Rule of Civil Procedure 12(d).  See, e.g., Gasner v. Cty. of Dinwiddie, 162 F.R.D. 280, 282 (E.D. Va. 1995) ("[W]hen a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment."). Noting the early stage of this litigation, the Court regards such conversion as premature and declines to do so.

618; Gasner, 162 F.R.D. at 282.  Since Plaintiffs failed to dispute the authenticity of any of Defendants' exhibits, the only remaining issue as to the thirteen exhibits is whether each is integral to Plaintiffs' Amended Complaint.

Exhibit 1, SCHEV's webpage discussing its Mission and Goals, and Exhibit 3, the Department of Labor's webpage, are not integral because neither is referenced nor relied upon in Plaintiffs' Amended Complaint.  Exhibits 2, 6, 7, and 8, relating to Plaintiffs' exemption requests and denials, are integral to Plaintiffs' Amended Complaint because they are explicitly referred to in Plaintiffs' factual allegations (Am. Compl. ¶¶ 61-69), and are relied upon by Plaintiffs in arguing that the Vocational School Law is a content-based restriction (id. ¶¶ 131, 133).  Exhibits 4 and 5, SCHEV's two deficiency letters sent to Plaintiffs, are integral because the letters are explicitly referred to in Plaintiffs' factual allegations (id. ¶¶ 54-56, 58), and they form the basis for Plaintiffs' arguments. Exhibits 9, 10, 11, 12, and 13, relating to SCHEV's threatened enforcement against Plaintiffs for operating a postsecondary school without SCHEV certification, are integral to Plaintiffs' Amended Complaint because they are expressly referred to in Plaintiffs' factual allegations (id. ¶¶ 95-103), and they form the basis for Plaintiffs' arguments.

Therefore, the Court considers Exhibits 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 in reviewing this Rule 12(b)(6) Motion to Dismiss.

Because Exhibits 1 and 3 are not integral to Plaintiffs' Amended Complaint, the Court does not consider them.

### ii. FIRST AMENDMENT ANALYSIS

Plaintiffs argue that the Vocational School Law is a content-based restriction and, therefore, subject to strict scrutiny. Defendants contend that the speech at issue constitutes commercial speech and, therefore, the applicable test is the four-step approach from Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of N.Y., 447 U.S. 557 (1980). Defendants alternatively argue that if the speech cannot be classified as commercial, then the Vocational School Law is content-neutral and, therefore, subject to intermediate scrutiny. As explained below, Plaintiffs plausibly allege that the Vocational School Law is a content-based regulation of speech for purposes of the Motion to Dismiss[3] and plausibly state a claim for relief under that standard.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" Reed v. Town of Gilbert, Ariz., 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const. Amend. 1). As the Supreme Court and Fourth Circuit have held, teaching is a form of constitutionally protected speech. Holder v. Humanitarian Law Project, 561 U.S. 1, 8-14 (2010) (holding that prohibitions on

---

[3] This determination of the standard of review is applicable solely to the Motion to Dismiss and does not preclude a different determination of the proper standard of review on a more developed record.

training designated foreign terrorist organizations triggered First Amendment scrutiny); Edwards v. City of Goldsboro, 178 F.3d 231, 245-49 (4th Cir. 1999) (finding the teaching of a gun safety course as speech entitled to First Amendment protection).

The primary purpose underlying the First Amendment "lies [in] the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." Turner Broad Sys., Inc. v. F.C.C., 512 U.S. 622, 641 (1994). For this reason, the First Amendment deprives the government of the "power to restrict expression because of its message, its ideas, its subject matter, or its content." Reed, 135 S. Ct. at 2226. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Id.; see R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 395 (1992).

The Supreme Court's decision in Reed provides the controlling analysis for evaluating the content neutrality of a law regulating the certification of postsecondary schools. Under Reed, the "crucial first step in the content-neutrality analysis[] [is] determining whether the law is content neutral on its face." Reed, 135 S. Ct. at 2228. A law is content-based on its face if it "applies to particular speech because of the topic discussed or the idea or message expressed." Id. at 2227. This "commonsense" analysis

requires the court to consider whether the regulation "on its face, draws distinctions based on the message a speaker conveys." Id. (quoting Sorell v. IMS Health, Inc., 564 U.S. 552, 564-64 (2011)). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." Id.

"Only when a regulation does not expressly draw distinctions based on [the speech's] communicative content may we examine, at the second step of the Reed analysis, whether the regulation 'cannot be justified without reference to the content of the regulated speech,' or . . . was adopted by the government 'because of disagreement with the message [the speech] conveys." Central Radio Co., Inc. v. City of Norfolk, Va., 811 F.3d 625, 632 (4th Cir. 2016) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).

Plaintiffs contend the Vocational School Law is a content-based restriction of speech because it "applies to particular speech because of the topic discussed or message expressed." Reed, 135 S. Ct. at 2227. Virginia Code § 23.1-217 prohibits any person from operating any "postsecondary school in the Commonwealth without certification to operate" from SCHEV. The statute defines the term "postsecondary school" as "any institution of higher education or non-college degree school offering formal instructional programs with a curriculum designed primarily for students who have completed the requirements for a high school diploma or its equivalent,"

24

including "programs of academic, vocational, and continuing professional education." Va. Code § 23.1-213. However, the statute expressly excludes "avocational and adult basic education programs," Va. Code § 23.1-213, and exempts "activities [and] programs offered by postsecondary schools, such as: "a nursing education program;" "any course of program provided or approved by any professional body, fraternal organization, civic club . . . for which the principal purpose is continuing or professional education . . .;" "any school, institute, or course of instruction offered by any trade associations . . . relating to the trade, business, or profession represented by such association;" "[schools] whose primary purpose is to provide religious or theological education;" and several more activities and programs. Va. Code §§ 23.1-213, 23.1-226.

Thus, to determine whether a postsecondary school or a particular course at a postsecondary school must be certified by SCHEV before operating for profit, one must look to the topics taught at the school more generally, as well as the topics of the individual instructional courses. These facial distinctions are "obvious," such that it is clear that, on its face, the Vocational School Law "defin[es] speech by the particular subject matter" of the course or program for purposes of a motion to dismiss. Reed, 135 S. Ct. at 2227. Here, if a postsecondary school or a program at a postsecondary school is subject to SCHEV's certification requirements, it is because of the content of its speech. "On its

face, the [Vocational School Law is] content-based because it applie[s] or d[oes] not apply as a result of content, that is, 'the topic discussed or the idea or message expressed." Central Radio Co., 811 F.3d at 633 (quoting Reed, 135 S. Ct. at 2227); see also Cahaly v. Larosa, 796 F.3d 399, 405 (4th Cir. 2015) (holding that South Carolina's anti-robocall statute was content-based because it "applie[d] to calls with a consumer or political message but [did] not reach calls made for any other purpose").

As a content-based speech regulation, we apply struct scrutiny in determining its constitutionality. "Under this standard, the government must show that the regulation 'further[ed] a compelling interest and [wa]s narrowly tailored to achieve that interest.'" Central Radio Co., 811 F.3d at 633 (quoting Reed, 135 S. Ct. at 2231). "If a less restrictive alternative would serve the [g]overnment's purpose, the legislature must use that alternative." United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000). "The [s]tate must specifically identify an 'actual problem' in need of solving, and the curtailment of free speech must be actually necessary to the solution." Brown v. Entm't Merchants Ass'n, 131 S. Ct. 2729, 2738 (2011) (citing Playboy, 529 U.S. at 822-23; R.A.V., 505 U.S. at 395). Defendants "must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that

the regulation will in fact alleviate these harms in a direct and material way." Turner Broadcasting Sys., 512 U.S. at 664.

For purposes of the Motion to Dismiss, Plaintiffs have plausibly alleged that the Vocational School Law is a content-based restriction. Applying these evidentiary requirements to SCHEV's Motion to Dismiss, it is clear that Plaintiffs have stated a plausible claim for relief. The Amended Complaint sufficiently alleges that SCHEV has no evidence that unregulated postsecondary schools have presented problems in the Commonwealth. (Am. Compl. ¶ 124 ("Virginia has no evidence that requiring the TMOG Learning Center to satisfy all of SCHEV's requirements advances any compelling or sufficiently important government interest."; id. ¶ 125 ("Virginia has no evidence of harms that would arise if the TMOG Learning Center did not need to satisfy all of SCHEV's requirements.").) Taking these allegations to be true, Plaintiffs can plausibly argue that the licensing regime is unduly burdensome because the interests it protects are simply not at risk. Though SCHEV has offered its own competing justifications, it has not demonstrated that Plaintiffs' allegations are insufficient to support their claim, especially when such allegations are construed in Plaintiffs' favor, as they must be at this stage. Therefore, it is RECOMMENDED that Defendants' Motion to Dismiss be DENIED.

### C. MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs argue that the Court should grant a preliminary injunction to enjoin SCHEV from enforcing the Vocational School Law against Plaintiffs during the pendency of this litigation.

### i. LIKELIHOOD OF SUCCESS ON THE MERITS

The first factor in the preliminary injunction analysis is whether Plaintiffs have made a clear showing of likelihood of success on the merits of their claim. As previously discussed, the parties propose three separate treads of analysis applicable to this action. Plaintiffs contend that the Vocational School Law is a content-based restriction and therefore subject to strict scrutiny. Defendants argue that the speech at issue constitutes commercial speech such that the proper standard is the Central Hudson framework. Alternatively, Defendants argue that the Vocational School Law is a content-neutral restriction and therefore subject to intermediate scrutiny.

### a. PROPER FRAMEWORK FOR FIRST AMENDMENT REVIEW

In determining the proper standard of review to apply when analyzing Plaintiff's Motion for Preliminary Injunction, the question of the proper standard is much closer than for the Motion to Dismiss. Under the preliminary injunction standard, it is not enough for Plaintiffs to simply point to the existence of allegations or evidence supporting their motion; the Court must weigh such considerations against the opposing arguments and evidence to

28

determine whether Plaintiffs have made a "clear showing" that they are likely to prevail on the merits of their claim.   Importantly, the Court must apply an even more exacting "clear showing" standard in this case because Plaintiffs seek to alter the regulatory scheme currently in place, thereby disturbing the "status quo." Perry, 471 F. App'x at 223.

While SCHEV's proffered justification for its certification requirement may be consistent with a content-based purpose, the proffered justification does not necessarily establish such a purpose.  That is, while content-based preferences could be embedded in SCHEV's desire to protect consumers and "ensure educational excellence" in the postsecondary school industry (Defs.' Opp. 13, ECF No. 7), that desire could also be entirely content neutral. Certainly, a desire to "protect[] the Commonwealth's citizens from fraudulent or substandard educational institutions[] and [to] ensur[e] that certified institutions meet minimal academic and administrative capability standards" (id. at 4), is not content-based by its own terms.  It is entirely possible that SCHEV designed its certification scheme to filter out would-be swindlers by ensuring that individuals providing postsecondary education have some understanding of the topics they are teaching and the administrative complexities involved with operating a postsecondary school. Indeed, the Fifth Circuit found this basic purpose of preventing fraud to be sufficiently content-neutral when analyzing New

29

Orleans's tour guide licensing regime in <u>Kagan v. City of New</u> <u>Orleans, La.</u>, 753 F.3d 560, 561 (5th Cir. 2014), <u>cert. denied</u>, 135 S. Ct. 1403 (2015) (finding the city's desire to "identif[y] those tour guides who . . . are reliable, being knowledgeable about the city, and trustworthy, law-abiding and free of drug addiction" to be content-neutral). The fact that the certification scheme permits postsecondary schools to speak on whatever topics they wish provides further support for this view. <u>See id.</u> at 562 ("[T]he New Orleans law in its requirements for a license has no effect whatsoever on the content of what tour guides say. Those who have the license can speak as they please . . . .").

Given the evidence suggesting a content-neutral purpose, the Court finds that Plaintiffs have failed to meet their burden to make a "clear showing" that the certification scheme was implemented for a content-based purpose. Though Plaintiffs have presented their own evidence of a content-based purpose, the Court finds that this evidence is not sufficient to establish the requisite "clear showing." Therefore, the Court finds that for the purposes of the preliminary injunction, Plaintiffs have failed to show that the regulations at issue are content-based. Thus, it is necessary to evaluate the Vocational School Law under intermediate scrutiny as a content-neutral restriction.[4]

---

[4] As previously noted, this determination does not preclude a different resolution of the standard of review applicable to Plaintiffs' claims on a more fully developed record.

Content-neutral restrictions are subject to intermediate scrutiny. McCullen v. Coakley, 134 S. Ct. 2518, 2534 (2014). Under intermediate scrutiny, a law "must be 'narrowly tailored to serve a significant governmental interest.'" Id. (quoting Ward, 491 U.S. at 796). "By demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrificing speech for efficiency.'" Id. at 2534-35 (quoting Riley v. Nat'l Federation of Blind of N.C., Inc., 487 U.S. 781, 795 (1988)). "[T]o be narrowly tailored, [the law] must not 'burden substantially more speech than is necessary to further the government's legitimate interest.'" Id. at 2535 (quoting Ward, 491 U.S. at 799). Although this does not mandate that a challenged statute "'be the least restrictive means of' serving the government's interests, . . . the government still 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" Id. (quoting Ward, 491 U.S. at 798, 799).

In Reynolds v. Middleton, 779 F.3d 222 (4th Cir. 2015), the Fourth Circuit explained the framework for intermediate scrutiny analysis. Once a plaintiff makes the requisite showing that a particular statute restricts speech, the burden shifts to the government "to prove the constitutionality of the speech restriction." Id. at 226. The Fourth Circuit then examined the ways in which the government can establish the existence of a

"significant governmental interest," explaining that an evidentiary record is not always necessary but that "common sense and the holdings of prior cases have been found sufficient to establish" government interests in the past. Id. at 227. In light of the Supreme Court's decision in McCullen, "objective evidence is not always required to show that a speech restriction furthers the government's interests." Id. at 228. At the same time, McCullen does require the "government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden." Id. at 229; see also Bruni v. City of Pittsburgh, 824 F.3d 353, 371 (3d Cir. 2016) ("McCullen required the sovereign to justify its regulation of political speech by describing the efforts it had made to address the government interests at stake by substantially less-restrictive methods or by showing that it seriously considered and reasonably rejected 'different methods that other jurisdictions have found effective.'").

Regulations that restrict commercial speech are subject to the analytical framework established in Central Hudson. 447 U.S. at 566. Commercial speech comprises of "expression related solely to the economic interests of the speaker and its audience." Id. at 561. Under Central Hudson,

> [Courts] must determine whether the expression
> is protected by the First Amendment. For

> commercial speech to come within that provision,
> it must at least concern lawful activity and not
> be misleading.   Next, we ask whether the
> asserted governmental interest is substantial.
> If both inquiries yield positive answers, we
> must determine whether the regulation directly
> advances the governmental interest asserted, and
> whether it is not more extensive than is
> necessary to serve that interest.

Id. at 566. In Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S.
469, 480 (1989), the Supreme Court held that the government need not
prove that a regulation of commercial speech is the least restrictive
means but merely "a means narrowly tailored to achieve the desired
objective."

Here, the Court has already determined that the speech at issue
is protected by the First Amendment. Supra III(B)(ii).   Teaching
postsecondary vocational classes to students solicited from the
public comprises a lawful transaction and is not misleading.   The
remaining inquiries under the Central Hudson test directly mimic the
analysis under intermediate scrutiny: direct advancement of a
substantial government interest and whether the regulation burdens
substantially more speech than necessary.   Central Hudson, 447 U.S.
at 566; McCullen, 134 S. Ct. at 2534; Wag More Dogs, Ltd. Liability
Corp. v. Cozart, 680 F.3d 359, 370 (4th Cir. 2012) ("As applied to
Wag More Dogs, the Sign Ordinance's regulation of commercial speech
satisfies intermediate scrutiny.")   Therefore, the Court need only
conduct one analysis of Plaintiffs' likelihood of success on the
merits regardless of the classification of the speech at issue.

Accordingly, the Court need not and does not determine at this juncture whether such speech constitutes commercial speech.

### b. EXISTENCE OF SUBSTANTIAL GOVERNMENT INTEREST

Plaintiffs argue that the government does not have a substantial interest in enforcing the certification scheme because its stated interest is invalid. (Pls.' Mem. Supp. Mot. Prelim. Injun. 27,[5] ECF No. 5.) Plaintiffs contend that SCHEV's interest in ensuring that postsecondary schools are properly qualified to teach such courses is necessarily connected to an interest in managing the content of their speech and, thus, this interest cannot justify the Vocational School Law. (Id.) Plaintiffs compare this action to Supreme Court precedents that struck down permitting requirements for door-to-door advocacy, Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 164-69 (2002), and union recruitment speech, Thomas v. Collins, 323 U.S. 516, 539-40 (1945). Although these cases recognize that "a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights of free speech and free assembly," Watchtower Bible, 536 U.S. at 164 (quoting Thomas, 323 U.S. at 539), Watchtower Bible also notes that this principle only applies "[s]o long as no more is involved than exercise of the rights of free speech and free assembly." Id. (quoting Thomas, 323 U.S. at 540).

---

[5] The Court employs the pagination assigned by the CM/ECF docketing system.

Here, SCHEV's stated interests involve more than the freedom of expression. SCHEV's interest in regulating this speech is "derivative of its mission to provide the citizens of the Commonwealth of Virginia access to reliable and valuable alternative higher education opportunities and vocational training operations by ensuring legal operations, ethical practices[,] and quality in the private postsecondary sector." (Defs.' Opp'n 13, ECF No. 7.) It is not simply that unqualified administrators and instructors at postsecondary schools may provide students with false information; it is that they may do so under the guise of providing "accurate" information and that such behavior may harm students and the postsecondary school industry overall. In addition to the concern regarding whether "accurate" information is provided during the instructional programs, SCHEV is also concerned that postsecondary schools may make misrepresentations regarding their tuition costs, the degrees or certifications available upon completion of the course of study, and other topics. (Id.) "The difference between what is promised and what is delivered is the core of the [government's] interest, not the content of the information itself." Billups v. City of Charleston, 194 F. Supp. 3d 452, 469 (D.S.C. 2016), appeal docketed No. 19-1044 (4th Cir. Jan. 10, 2019).

Courts have long recognized that governments have a legitimate and substantial interest in preventing fraudulent or misleading commercial operations and protecting their industries. See, e.g.,

*Riley*, 487 U.S. at 782 ("[A] [s]tate's interest in protecting [] the public from fraud is a sufficiently substantial interest to justify a narrowly tailored regulation."); *Kagan*, 753 F.3d at 561-62 (finding the government's interest in protecting the tourism industry and its visitors a substantial government interest). In light of these prior decisions, the Court finds that SCHEV has a substantial interest in regulating the private postsecondary sector.

### c. ADVANCEMENT OF SUBSTANTIAL GOVERNMENT INTEREST

Plaintiffs fail to address the issue of whether the Vocational School Law actually advances the governmental interest of consumer protection. Instead, Plaintiffs argue that a host of less restrictive alternatives would further SCHEV's interests in regulating the postsecondary school industry. However, these arguments are better addressed under the final prong of the intermediate scrutiny analysis—whether SCHEV's certification scheme burdens "substantially more speech than is necessary to further the government's legitimate interests." *McCullen*, 134 S. Ct. at 2535 (internal quotations omitted).

SCHEV argues that the Vocational School Law directly advances its interest in consumer protection in a variety of ways. For example, "requiring financial audits and refund or withdrawal policies promotes consumer protection and ensures that students and institutions do not misappropriate qualifying federal funds; requiring teachers to provide licensure or other teaching

credentials promotes consumer protection by assuring students that they are being taught by qualified individuals; requiring school to maintain student records allows students to verify their attendance at an institution; requiring course catalogues and school brochures promotes consumer protection and helps students determine whether certain institutions meet their educational or coursework needs; requiring financial aid opportunities and policies promotes consumer protection and helps students make educated decisions in determining how to fund their education." (Defs.' Opp'n 14 n.8, ECF No. 7.) While Plaintiffs regard these measures as both excessive and imprecise, it appears that prospective postsecondary schools who can obtain certification under SCHEV's regime are more likely to be knowledgeable and qualified in their areas of instruction, and less likely to take advantage of students, than those who can or do not. Therefore, the Court finds that the Vocational School Law directly advances substantial government interests.

### d. EXCESSIVE BURDEN ON SPEECH

The final inquiry regarding Plaintiffs' likelihood of success on the merits is whether the Vocational School Law places an excessive burden on speech in relation to the interests it promotes. "Government[s] may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward, 491 U.S. at 799. But the government need not use the "least restrictive means" of advancing its interests. Turner

Broad Sys., 512 U.S. at 662. At the same time, this standard mandates that the government's interests "be achieved less effectively absent the regulation." Id. (quoting Ward, 491 U.S. at 799) (internal quotations omitted).

The Fourth Circuit interpreted the Supreme Court's decision in McCullen to require the "government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden." Reynolds, 779 F.3d at 229. "[T]he analysis may be guided by whether the alternative regulation would cover the problematic activity . . . and whether enforcement of such alternatives is likely to be practicable." Billups, 194 F. Supp. 3d at 474 (internal citations omitted); see also McCullen, 134 S. Ct. at 2535, 2540 (analyzing provisions of existing local ordinances and laws of other jurisdiction but finding that the problems were not so widespread, difficult to detect, or difficult to prosecute that enforcement through more specific regulations would be impracticable). McCullen, as interpreted by the Fourth Circuit in Reynolds, requires SCHEV to provide some evidence that: (i) unregulated postsecondary schools posed a threat to its interests in protecting students from fraud and deceit; and, (ii) that it did not forgo readily available, less intrusive means of protecting those interests.

Plaintiffs argue that the Vocational School Law burdens a great deal more speech than is necessary to promote the Commonwealth's interest in consumer protection. Because Plaintiffs do not confer degrees or accept federally-subsidized student loans, Plaintiffs argue that the Vocational School Law unnecessarily burdens their speech. (Reply 14, ECF No. 9.) In addition, because some of Plaintiffs' programs have such a brief duration, such as Jonathan McGlothian's thirty-five-hour project management preparation course, it is unnecessary to apply attendance, refund, record-retention and other policies to his program. (Id. at 15.)

Plaintiffs list a host of less restrictive potential measures by which SCHEV might promote its interests, suggesting: (i) prosecution under Virginia's anti-fraud statute; (ii) use of complaint and investigation procedures under the Attorney General's consumer-protection website; (iii) education and the provision of information from the Commonwealth to prospective students regarding legitimate vocational education classes; (iv) the requirement of a surety bond; and, (v) limiting the Vocational School Law to regulating colleges and universities that accept federally-subsidized student loans. (Id. at 14; Pls.' Mem. Supp. Prelim. Inj. 21-22, ECF No. 5.)

Defendants argue that the existing regulatory scheme leaves open ample alternative channels for Plaintiffs to teach their desired courses so long as they do not solicit students directly from the

public.   (Defs.' Opp'n 14, ECF No. 7.)   According to Defendants, SCHEV's certification scheme applies to a narrow class of individuals:   persons wishing to operate for-profit educational businesses, offering vocational courses to students solicited directly from the public.  (Defs.' Opp'n 14, ECF No. 7.)  Citizens within the Commonwealth are free to offer vocational courses under contracts with employers and military units, as Plaintiffs have done for some time, and are free to provide such classes for no compensation without first obtaining SCHEV certification.

On the record before it, the Court does not find that Plaintiffs are likely to prevail at trial, especially under the applicable heightened standard.   First, the Vocational School Law burdens a small range of speech:  for-profit postsecondary institutions offering vocational skills courses to students solicited directly from the public.  Unlike in McCullen and Reynolds, the Vocational School Law does not absolutely prohibit certain speakers from engaging in certain forms of speech in certain locations.  McCullen, 134 S. Ct. at 2535 (discussing that the abortion facility "buffer zone" regulations, which "carve out a significant portion of the adjacent public sidewalks, pushing petitioners well back from the clinics' entrances and driveways, imposed "serious burdens"); Reynolds, 779 F.3d at 231 (striking down roadside solicitation ordinance that "prohibit[ed] all forms of leafletting, which is one of the most important forms of political speech . . . as well as

soliciting any kind of contribution, whether political or charitable, or selling or attempting to sell goods or services"). Schools without SCHEV certification may engage in postsecondary vocational education as much as they desire, so long as they do not charge for it. Moreover, paid vocational education speech is not a form of expression that has "historically been [] closely associated with the transmission of ideas." McCullen, 134 S. Ct. at 2536 (noting "normal conversation and leafletting on a public sidewalk" as forms of expression that have historically been associated with the transmission of ideas). Here, the narrow swath of speech affected by the Vocational School law weighs in SCHEV's favor.

At the same time, there is very little evidence in the record that SCHEV considered readily available means other than requiring a certification scheme for postsecondary vocational skills institutions. SCHEV has not shown that unregulated postsecondary schools have caused harm within the Commonwealth. Nor has SCHEV provided any evidence that the Commonwealth considered alternatives before implementing the Vocational School Law.

SCHEV cites to two lawsuits brought in different states by former students and state Attorneys General as evidence of the harms that unregulated for-profit educational businesses have inflicted on the public. See Sanchez v. ASA College, Inc., No. 14-cv-5006, 2015 WL 3540836 (S.D.N.Y. June 5, 2015) (class action by former students of ASA College, Inc. who alleged systematic and fraudulent

misrepresentations concerning ASA's certificate and degree programs); People of State of California v. Ashford University, LLC, No. RG17883963 (Cal. Sup. Ct. Nov. 29, 2017) (unpublished Compl.) (suit brought by California's Attorney General alleging that Ashford University misled students about its tuition costs burying them in student loan debt and providing little value in return). Although the Court may consider case law from other jurisdictions and employ common sense in determining the issue of narrow tailoring, these actions provide little support that Virginia's citizens interests are at risk.[6]

Although SCHEV has failed to present evidence that it took specific efforts to examine and consider less restrictive alternatives, the Court remains unconvinced that Plaintiffs' proposed measures would adequately protect Virginia citizens' interests. First, there is reason to believe that prosecution under existing consumer protection and anti-fraud laws would be ineffective due to the limited duration of many instructional courses. It would be nearly impossible for Virginia law enforcement to detect when particular students are victims of fraud when certain programs, like Jonathan McGlothian's thirty-five hour preparation course, last for only one week. Given that SCHEV's Private Postsecondary Education Unit certifies and regulates 106 degree-

---

[6] Additionally, Sanchez v. ASA College, Inc., No. 14-cv-5006, 2015 WL 3540836 (S.D.N.Y. June 5, 2015) lends little credence to SCHEV's arguments since the action was terminated upon a Motion to Dismiss.

granting institutions and 134 career-technical schools that provide instruction to approximately 49,000 Virginians annually, (Ex. 1, ECF No. 7-1 at ¶ 4), it would be impracticable for law enforcement to detect fraudulent activity on this scale for such limited-duration programming.

Second, Plaintiffs argue that the Commonwealth could use the complaint and investigation procedures under the Attorney General's consumer-protection website as an equally effective means of protecting consumers in the Commonwealth. The record contains no indication that any other jurisdictions have adopted this approach. Moreover, this approach relies solely upon students and prospective students to detect and report fraudulent or misleading activity on behalf of their educational institutions, when common sense dictates that these students are not in the best position to recognize or detect such fraudulent behavior. The students at private postsecondary institutions do not have the means or abilities to fully determine whether instructors are teaching accurate information needed for certification examinations or whether the administrative affairs of the institution are being managed in a lawful manner. Much of the information required to detect such fraudulent or deceptive behavior would be unavailable to the students, making reporting impossible.

Plaintiffs third suggestion, the provision of information and educational materials from the Commonwealth to prospective students

regarding legitimate vocational education classes, is impracticable for the same reasons as relying on the Attorney General's consumer protection website complaint procedures: it places the entire burden of detecting fraud and deceit on the students. Even if students knew the warning signs of fraudulent activity, they would still lack the access needed to determine whether an institution was operating legitimately. Because students lack the means to detect and uncover fraudulent behavior, it is an impracticable alternative to a government-managed certification scheme.

Plaintiffs' fourth and fifth suggestions, the requirement of a surety bond and limiting the Vocational School Law to regulating only colleges and universities that accept federally-subsidized student loans, are not viable alternatives because they address a limited number of the interests at risk. Although a surety bond would help ensure that students have some means of financial security against an institution that has financially defrauded them, it would not ensure that postsecondary schools are providing accurate information or fully preparing students for certain vocations, as promised by the institution. Additionally, this method also relies on the student's ability to detect when schools have defrauded him or her to take advantage of any surety bond.

Limiting the application of the Vocational School Law to only institutions that accept federal funds also deals with a limited issue: ensuring that students who are not receiving value from the

44

institution are not unduly burdened with student loan debt.   These
methods deal solely with the financial ramifications of misleading
postsecondary schools but do nothing with regard to the quality of
the educational programs or the lack of information available to
prospective students in selecting a postsecondary school to attend.
Nor does this alternative address students that do not use federal
funding in paying for postsecondary education.

In light of these considerations, the Court finds the "existing
evidence [] altogether inadequate to demonstrate that less
restrictive alternatives proposed by [Plaintiffs] 'would be at least
as effective in achieving the legitimate purpose that the [Vocational
School Law] was enacted to serve.'"   Centro Tepeyac v. Montgomery
County, 722 F.3d 184, 190 (4th Cir. 2013) (quoting Reno v. ACLU, 521
U.S. 844, 874 (1997)).   Plaintiffs ask the Court to enjoin the
enforcement of a certification scheme that does not impose a large
burden on speech, where there is at least some evidence that the
substantial interests that scheme is designed to protect are at risk.
Despite the fact that the record does not show that SCHEV gave any
consideration to the less restrictive alternatives Plaintiffs
proposed, very serious questions exist as to whether such proposals
would protect these interests to the same degree as the Vocational
School Law.   On the record before it, the Court cannot find that
Plaintiffs have met their heighted burden to clearly show a
likelihood of success on the merits.

## ii. IRREPARABLE HARM

Plaintiffs claim that absent an injunction, they will suffer the irreparable harm of losing their First Amendment freedoms during the pendency of this action. "[T]he Supreme Court has explained that 'loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." Newsom ex rel Newsom v. Ablemarle Cty. Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003)(quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)). However, "in the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits." WV Ass'n of Club Owners & Fraternal Servs., Inc., v. Musgrave, 553 F.3d 292, 298 (4th Cir. 2009); see also Newsom, 354 F.3d at 254-55. Because Plaintiffs have failed to prove likelihood of success on the merits of their First Amendment claim, their alleged First Amendment losses cannot constitute irreparable harm.

Plaintiffs next argue that they will suffer irreparable harm if SCHEV is not enjoined from enforcing its certification scheme against Plaintiffs because they will lose valuable business opportunities and suffer monetary losses on rent payments on classroom space that they cannot use to teach vocational skills to students solicited from the public.[7] These injuries constitute purely economic losses.

---

[7] Plaintiffs rely on Giovani Carandola, Ltd. v. Bason, 303 F.3d 507 (4th Cir. 2002) as support for their claim that "the loss of valuable business opportunities is [] an irreparable injury." (Pls.' Mem. Supp. Mot. Prelim. Inj. 32, ECF No. 5.) Plaintiffs' reliance on Giovani Carandola is misplaced. In Giovani Carandola,

However, "[w]here the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." Hughes Network Systems, Inc. v. InterDigital Commc'ns Corp., 17 F.3d 691, 694 (4th Cir. 1994); see also Sampson v. Murray, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.   The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").   In this case, Plaintiffs may be adequately compensated at trial for their economic injuries; therefore, Plaintiffs have failed to make a clear showing of irreparable harm.

### iii. BALANCE OF EQUITIES AND PUBLIC INTEREST

Plaintiffs must next show that the balance of equities tips in their favor. Winter, 555 U.S. at 20.   This inquiry asks courts to "balance the competing claims of injury and [] consider the effect on each party of the granting or withholding of the requested relief." Id. at 24 (citing Amoco Production Co. v. Vill. of Gambell,

---

the Fourth Circuit affirmed the district court's finding that the plaintiff would likely succeed on the merits of its First Amendment claim.   303 F.3d at 520. Thus, the plaintiff's irreparable harm was the loss of First Amendment freedoms. Id. at 520-21.   The Court noted in dicta that the plaintiff also faced the threat of fines, a temporary suspension of its license, and the loss of valuable business opportunities.   Id. at 521.   However, the Fourth Circuit did not hold that the loss of valuable business opportunities, on its own, constitutes irreparable injury.   Id.   As explained above, because Plaintiffs have not shown their likelihood of success on the merits, the Giovani Carandola decision is distinguishable.

*Alaska*, 480 U.S. 531, 542 (1987)).   Plaintiffs must also establish by a clear showing that the public interest favors granting an injunction.   Id. at 20.   When evaluating this factor, courts must "pay particular regard for the public consequences" of granting an injunction.   Id.   The Fourth Circuit has held that a government suffers no harm from the "issuance of a preliminary injunction which prevents it from enforcing a regulation [] which . . . is likely to be found unconstitutional," and that "upholding constitutional rights serves the public interest."   *Newsom*, 354 F.3d at 261.

Regarding the balance of equities, the Commonwealth would clearly suffer harm if it was prevented from enforcing the Vocational School Law against Plaintiffs and protecting the postsecondary education sector.   Relatedly, the public has an interest in preventing unqualified or deceitful individuals and postsecondary schools from misleading prospective students.   Because the Court finds that Plaintiffs have failed to demonstrate that they are likely to prevail on the merits on the record before it, both the balance of equities and the public interest weigh against the issuance of a preliminary injunction.   Therefore, Plaintiffs have failed to make a clear showing as to the balance of equities and the public interest. Because Plaintiffs failed to make the requisite clear showing of each factor of the preliminary injunction standard, it is RECOMMENDED that Plaintiffs' Motion for Preliminary Injunction be DENIED.

## IV. CONCLUSION

Accordingly, for the reasons discussed above, the undersigned RECOMMENDS that Defendants' Motion to Dismiss (ECF No. 20) be DENIED and Plaintiffs' Motion for Preliminary Injunction (ECF No. 4) be DENIED.

The Clerk is directed to file this Report and Recommendation electronically and send a copy to all counsel of record and to the Honorable Robert E. Payne, Senior United States District Judge.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions, and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal those findings and conclusions accepted and adopted by the District Judge except upon the grounds of plain error.

_____ /s/

Roderick C. Young
United States Magistrate Judge

Richmond, Virginia
Date: January 23, 2019